**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Interstate Fire & Casualty Company, Inc.,)
an Illinois corporation,                                    )
                                                                          )
        Plaintiff/Counterdefendant,    )
                                                                          )
vs.                                                                    )
                                                                          )
                                                                          )
The Roman Catholic Church of the)
Diocese of Phoenix, a corporation sole, by)
and through Bishop Thomas J. Olmsted,)
his predecessors and successors,            )
                                                                          )
        Defendant/Counterclaimant.    )
                                                                          )
_____ )

No. CV-09-01405-PHX-NVW

**ORDER**

     In the first phase of this declaratory judgment action, Plaintiff/Counterdefendant Interstate Fire & Casualty Company ("Interstate Fire") and Defendant/Counterclaimant The Roman Catholic Church of the Diocese of Phoenix ("the Diocese") seek a determination as to whether certain of the Diocese's claimed defense and indemnity costs are covered under several excess liability indemnity policies issued by Interstate Fire. Now before the Court are Interstate Fire's Motion for Summary Judgment (Doc. 36) and the Diocese's Motion for Partial Summary Judgment on First Phase Issues (Doc. 38).  For the following reasons, Interstate Fire's motion is denied and the Diocese's motion is granted in part and denied in part.

1    **I.      Legal Standard**

2           Summary judgment is warranted if the evidence shows there is no genuine issue as

3    to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.

4    R. Civ. P. 56(c).  The moving party must produce sufficient evidence to persuade the

5    Court that there is no genuine issue of material fact.  *Nissan Fire & Marine Ins. Co., Ltd.*

6    *v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  Conversely, to defeat a motion

7    for summary judgment, the nonmoving party must show that there are genuine issues of

8    material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A material fact

9    is one that might affect the outcome of the suit under the governing law, and a factual

10   issue is genuine "if the evidence is such that a reasonable jury could return a verdict for

11   the nonmoving party."  *Id.* at 248.

12          The moving party bears the initial burden of identifying those portions of the

13   pleadings, depositions, answers to interrogatories, and admissions on file, together with

14   the affidavits, if any, which it believes demonstrate the absence of any genuine issue of

15   material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the nonmoving

16   party would bear the burden of persuasion at trial, the moving party may carry its initial

17   burden of production under Rule 56(c) by producing "evidence negating an essential

18   element of the nonmoving party's case," or by showing, "after suitable discovery," that

19   the "nonmoving party does not have enough evidence of an essential element of its claim

20   or defense to carry its ultimate burden of persuasion at trial."  *Nissan Fire*, 210 F.3d at

21   1105-06; *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574

22   (9th Cir. 1990).

23          When the moving party has carried its burden under Rule 56(c), the nonmoving

24   party must produce evidence to support its claim or defense by more than simply showing

25   "there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.*

26   *v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Where the record, taken as a whole,

27   could not lead a rational trier of fact to find for the nonmoving party, there is no genuine

28   issue of material fact for trial.  *Id.*  The nonmoving party's evidence is presumed to be

true and all inferences from the evidence are drawn in the light most favorable to the nonmoving party. *Eisenberg v. Ins. Co. of North America*, 815 F.2d 1285, 1289 (9th Cir. 1987). If the nonmoving party produces direct evidence of a genuine issue of material fact, the motion for summary judgment must be denied. *Id.*

**II.   Undisputed Facts**

**A.   Terms of the Diocese's Insurance Coverage**

From January 1, 1979, to at least July 1, 1986, the Diocese was insured by Certain Underwriters at Lloyd's of London under successive primary liability indemnity policies, which provided a first layer of occurrence-based coverage after exhaustion of a $50,000 self-insured retention per occurrence. The policies governing the time periods at issue in this case contain the following insuring clause:

<u>SECTION II CASUALTY INSURANCE</u>
<u>INSURING AGREEMENTS</u>

<u>AGREEMENT C – GENERAL LIABILITY</u>: Underwriters hereby agree, subject to the limitations, terms and conditions hereunder mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability imposed upon the Assured by law or assumed by the Named Assured under contract or agreement, for *damages direct or consequential, and expenses, all as more fully defined by the term "ultimate net loss"*, on account of personal injuries, including death at any time resulting therefrom, suffered or alleged to have been suffered by any person or persons (excepting employees of the Assured injured in the course of their employment); and/or damage to or destruction of property or the loss of use thereof; *arising out of any occurrence* happening during the period of Insurance.

(Emphasis added). The term "Assured" includes the Diocese and, among others, "any official, trustee or employee of [the Diocese] while acting within the scope of his duties as such . . . ." The term "ultimate net loss" is defined as follows:

4. <u>ULTIMATE NET LOSS</u> - The term "ultimate net loss" shall mean the total sum which the Assured becomes obligated to pay by reason of personal injury or property damage claims, either through adjudication or compromise, after making proper deductions for all recoveries and salvages, and *shall also include* hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, *expenses for* doctors, *lawyers*, nurses and investigators and other persons, *and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder . . . .*

(Emphasis added).  The policies also define the term "occurrence":

> 3. <u>OCCURRENCE</u> - The term "occurrence" wherever used herein shall mean an *accident* or a *happening* or *event* or a *continuous or repeated exposure to conditions* which *unexpectedly and unintentionally* results in personal injury, or damage to property during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one location shall be deemed one occurrence.

(Emphasis added).  Finally, the policies contain the following exclusion clause:

THIS INSURANCE DOES NOT APPLY -

> (a) to liability of *any Assured* for assault and battery committed by or at the direction of *such Assured* except liability for Personal Injury or Death resulting from any act alleged to be assault and battery for the purpose of preventing injury to persons or damage to property[.]

(Emphasis added).

In addition to primary coverage from Lloyd's, the Diocese obtained excess liability indemnity coverage from Interstate Fire for the same time periods.  The Interstate Fire policies, which provide a second layer of coverage for losses in excess of the liability limits of the underlying Lloyd's policies, "follow form" to the Lloyd's policies and therefore incorporate the terms of those policies.

**B.     Underlying Claims**

On December 3, 2003, two individuals, Tim Brockman and R. Martinez, filed separate suits against the Diocese and others in California state court.  The Brockman Complaint (Doc. 1-1) asserted eighteen claims predicated on allegations that Henry Perez, a priest employed by the Diocese, sexually molested and abused Brockman from 1978 to 1979 while he was training to be an altar boy.  The Martinez Complaint (Doc. 1-2) similarly asserted eighteen claims based on allegations that Perez sexually molested and abused Martinez in or around 1981.  Both Brockman and Martinez were fifteen years old at the time of the alleged acts of abuse.

Two additional individuals, Harry Takata and William Cesolini, brought separate suits against the Diocese in Arizona state court on March 23, 2004, and January 27, 2005. The factual predicates of those suits were substantially similar to those of the California suits.  The Takata Complaint (Doc. 1-3) asserted ten claims based on allegations that John

1   Giandelone, another Diocese priest, sexually molested and abused Takata, while he was

2   an altar boy, on six separate occasions from 1981 to 1984.  The Cesolini Complaint (Doc.

3   1-4) asserted six claims derived from allegations that three Diocese priests sexually

4   molested Cesolini and/or concealed the abuse in or around 1985.

5          The four plaintiffs' claims against the Diocese ranged in nature from intentional

6   torts to negligence.  Sexual molestation or abuse by a Diocese priest was a factual

7   element common to all claims.  The Diocese settled all four cases and thereafter sought

8   payment from Lloyd's under the primary liability indemnity policies.  On December 12,

9   2008, after receiving partial payment from Lloyd's, the Diocese timely submitted a claim

10  to Interstate Fire for excess coverage of the costs of defense and settlement.  On July 2,

11  2009, Interstate Fire responded by filing this suit, in which it seeks a declaration that the

12  Diocese's remaining defense and settlement costs are not covered by the terms of the

13  excess liability indemnity policies.  (Doc. 1.)  The Diocese counterclaimed for breach of

14  contract and bad faith, seeking, in part, compensatory damages in the principal amount of

15  $1,979,431.53.  (Doc. 16.)

16         Based on the parties' Amended Joint Proposed Discovery Plan (Doc. 30), the

17  Court permitted the parties to file simultaneous "first phase" motions for summary

18  judgment "based on the assumption that the underlying factual basis necessary to support

19  each claim is true for the purpose of determining [coverage]."  (*Id.*)  Interstate Fire now

20  moves for summary judgment on the ground that there is no excess indemnity coverage

21  because the settled claims do not constitute an "occurrence" within the policy definition

22  and therefore do not fall within the scope of the insuring clause in the Lloyd's policies.

23  Alternatively, Interstate Fire maintains that the claims are excluded by the assault and

24  battery exclusion clause and/or application of the efficient proximate cause doctrine.  The

25  Diocese, on the other hand, moves for partial summary judgment that the claims are

26  covered under the policy and are not excluded by either the assault and battery exclusion

27  clause or the efficient proximate cause doctrine.

28  **III.    Analysis**

The parties agree that Arizona substantive law governs the issues presented.  In Arizona, interpretation of an insurance contract is a question of law.  *Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 199 Ariz. 43, 46, 13 P.3d 785, 788 (Ct. App. 2000).  Clauses in insurance contracts are construed according to their plain and ordinary meaning.  *Id.*  To the extent a clause is ambiguous, it is construed against the insurer.  *Id.*  While the insured bears the burden of establishing coverage under an insuring clause, the insurer bears the burden of establishing the applicability of any exclusions.  *Id.* (citing *Pac. Indem. Co. v. Kohlhase*, 9 Ariz. App. 595, 597, 455 P.2d 277, 279 (1969)).

### A.    Coverage

According to the plain language of the insuring clause at issue in this case, a claim is covered if the Diocese suffered an "ultimate net loss" on account of personal injuries or property damage that arose from an "occurrence" during the policy period.  There is no dispute that the costs incurred by the Diocese in defending and settling the four underlying suits are generally of the type covered by the definition of "ultimate net loss," which expressly references expenses for lawyers and settlement of claims and suits.  The dispute centers on whether those costs arose from a covered "occurrence."  As the briefing has revealed, the parties also dispute which party has the burden of proving that the triggering event "unexpectedly and unintentionally" resulted in personal injury.

As explained, the claims against the Diocese ranged in nature from intentional torts to negligence.  For purposes of classification, Interstate Fire divided the claims into three categories.  The first category encompasses those claims requiring proof of intentional or willful conduct intended or known to result in injury.  Those claims include childhood sexual abuse, fraud, conspiracy to commit fraud, intentional infliction of emotional distress, willful harm/injury to a child, aiding and abetting a felon, violation of the business/professions code, sexual assault, battery, and state law racketeering.  The second and third categories include the remaining underlying claims, all of which are based on some form of derivative negligence liability.  These claims include general negligence, negligent supervision, negligent hiring/retention, failure to report child abuse,

1   negligence per se, premises liability, negligent misrepresentation, breach of fiduciary

2   duty, fiduciary fraud, and negligent failure to warn/train/educate.  Interstate Fire labels

3   the second category of claims "hybrid claims," for which the underlying factual basis

4   could have been based on one or both of the following: (1) the Diocese had actual

5   knowledge of the priests' prior acts of abuse yet failed to take reasonable measures to

6   prevent future abuse; or (2) the Diocese "should have known" of the priests' proclivity for

7   abusing children.  Interstate Fire identifies the third category claims as those based only

8   on negligence, and not on any claim of actual knowledge or intentionality.

9        Interstate Fire contends that to the extent any of the claims against the Diocese

10  were based on a theory of vicarious liability for the priests' intentional misconduct, the

11  claims are not covered.  Interstate Fire further maintains that the intentional nature of the

12  Category 1 claims precludes coverage for all of those claims.[1]  As to the Category 2

13  claims, Interstate Fire maintains that these hybrid claims are not covered to the extent

14  they were based on proof that the Diocese had actual knowledge of the priest's proclivity

15  for abuse.  Interstate Fire concedes, however, that to the extent the Category 2 claims

16  were based instead on the factual basis that the Diocese "should have known" of a priest's

17  proclivity for abuse, the underlying conduct may have qualified as an "occurrence."

18  Interstate Fire also concedes that the underlying conduct of the Category 3 claims based

19  solely on negligence could also constitute an "occurrence" under the policy.

20        The Diocese apparently does not contest the argument that claims are not covered

21

22  [1]The Diocese does not contest Interstate Fire's assertion that 57 of claims in the underlying
    settlement do not constitute "occurrences" under the policy.  The Court will grant summary
23  judgment on this issue to the extent it finds these 57 claims do not constitute "occurrences"
    under the policy.  However, to the extent Interstate Fire seeks a further determination from
24  the Court that Interstate Fire is not obligated to pay any sums related to these 57 claims, the
    Court declines to issue a final decision at this time.  The meaning of the "ultimate net loss"
25  provision in the policy has not been fully briefed and is not properly considered as part of the
    Phase I motions, as defined by the parties.  The Court notes that generally, a provider of an
26  indemnity policy is only obligated to indemnify claims which are covered under the policy.
    Nonetheless, no final decision will be issued at this time with respect to Interstate Fire's
27  ultimate obligations with respect to these 57 claims.

28

1  to the extent they relied on a theory of vicarious liability for the priests' intentional

2  misconduct.  Nor does it dispute Interstate Fire's second argument that none of the

3  Category 1 claims are covered, and it accepts Interstate Fire's concession that the

4  Category 2 claims which are based on a theory of what the Diocese "should have known"

5  and all of the Category 3 claims may constitute an occurrence.  Therefore, the only

6  remaining claims where coverage is disputed is for those Category 2 "hybrid" claims that

7  are based on proof that the Diocese had actual knowledge of the priests' proclivity for

8  abuse.  There are two related issues contested by the parties: first, whether the

9  "unexpectedly and unintentionally" language in the definition of "occurrence" operates as

10  an exclusion and must therefore be proven by Interstate Fire, or whether that language is a

11  prerequisite to establishing coverage and must be proven by the Diocese; and second, if

12  the facts presented establish that there was in fact an "occurrence" within the meaning of

13  the insuring agreement that establishes coverage.

14                          **1.  Burden of Proof**[2]

15          Although the ultimate question to be resolved by the cross-motions for summary

16  judgment is whether the underlying claims against the Diocese constitute an "occurrence"

17  under the insuring agreement and trigger Interstate Fire's duty to indemnify the Diocese,

18  a threshold question has arisen in the briefing about which party has the burden of

19  proving that the underlying loss was unexpected and unintentional.  It is undisputed that

20  the Diocese, as the insured, has the duty to establish insurance coverage and that

21  Interstate Fire, as the insurer, has the duty to establish the applicability of any exclusions.

22  *See Kohlhase*, 9 Ariz. App. at 597, 455 P.2d at 279.  The controversy arises as to whether

23  the "unexpectedly and unintentionally" language found in the policy's definition of

24

25  ───────────────

26  [2]The Court agrees with the note in *ZRZ Realty Co. v. Beneficial Fire and Cas. Ins. Co.,* 222
    Or. App. 453, 461 n.5, 194 P.3d 167, 172 n.5 (2008) that "the term 'burden of proof' is an

27  inexact term.  Nonetheless, because the parties and the courts that have addressed these
    issues have frequently referred to the 'burden of proof' we use that term in the text of this

28  opinion for convenience."

1    "occurrence" operates as a prerequisite for establishing coverage or as an exclusion.

2    Interstate Fire contends that because the "unexpectedly and unintentionally" language

3    appears in the definition of "occurrence," and establishing that there was an "occurrence"

4    is the Diocese's burden, the Diocese likewise has the burden of establishing that the

5    underlying loss was unexpected and unintentional as part of its duty to establish coverage.

6    The Diocese asserts that  the "unexpectedly and unintentionally" language has an

7    exclusionary effect, and Interstate Fire must therefore prove that the loss was expected

8    and intentional in order to negate coverage.

9          Different jurisdictions have reached different conclusions about whether similar

10   "unexpectedly and unintentionally" language, when found in the definition of an

11   "occurrence" in the insuring agreement, constitutes an exclusion which the insurer must

12   prove or is a prerequisite to establishing coverage, which the insured must prove.

13   *Compare Clemco Indus. v. Commercial Union Ins. Co.,* 664 F.Supp. 816, 820-21 (N.D.

14   Cal. 1987) (holding that even though limiting language was located in definitional clause

15   of insuring agreement, language operated as exclusion and burden of proof was therefore

16   on insurer to show loss was expected or intended by insured) *with Queen City Farms, Inc.*

17   *v. Central Nat. Ins. Co. Of Omaha*, 126 Wash. 2d.50, 882 P.2d 703 (holding that limiting

18   language, because it was located in definitional clause of insurance policy, operated as a

19   prerequisite for establishing coverage and burden of proof was on insured to show loss

20   was unexpected and unintended).  As noted in Couch on Insurance (2d. Ed.) §254:53,

21   "[i]t is generally difficult to reconcile these two lines of cases any way other than as an

22   analytical disagreement as to whether the provision is a coverage provision or is to be

23   considered an exclusion or exception."

24         There is no controlling Arizona case law determining where Arizona places the

25   burden of proof on this issue.  The Diocese points the Court to *Phoenix Control Systems,*

26   *Inc. v Ins. Co. of North America*, 165 Ariz. 31, 34-35, 796 P.2d 463, 466-67 (1990), for

27   the proposition that Arizona treats limiting language in the policy definition of

28   "occurrence" as an exclusion which the insurer must prove.  However, that case did not

1   discuss the issue of burden shifting; rather, it simply referred to the definitional clause's

2   "neither expected nor intended" language as an exclusion, without elaborating on this

3   label's effect on the burden of proof.  In response to the Diocese's arguments, Interstate

4   Fire directs the Court to *Gordinier v. Aetna Cas. & Sur. Co.*, 154 Ariz. 266, 269 n.4, 742

5   P.2d 273, 280 (1984), which notes that "[r]egardless of the category, each provision [of

6   the insurance agreement] potentially may be used to restrict the scope of coverage.  For

7   instance . . . a definition can contain a restriction that could have been expressed as an

8   exclusion."  This citation merely restates the problem; it does not resolve in Interstate

9   Fire's favor whether Arizona treats limiting language contained in a definitional clause as

10   a prerequisite to establishing coverage or as an exclusion.

11       It is unnecessary to decide at this time, in the abstract, the question of which party

12   bears the burden of proof.  The burden of proof often is not dispositive.  It is more likely

13   that the evidence regarding what the Diocese knew and did will be decisive, irrespective

14   of which party presents it to the Court.  Without deciding the question of whether the

15   Diocese or Interstate Fire bears the burden of proof with respect to the exclusionary

16   language in the definition of "occurrence" under the policy, the Court finds that summary

17   judgment as to the issue of whether there was a qualifying "occurrence" under the

18   insuring agreement is also inappropriate at this time for the reasons stated below.

19                    **2.  Facts Establishing an "Occurrence" Under the Policy**

20       As noted above, the policies define "occurrence" as an "accident or a happening or

21   event or a continuous or repeated exposure to conditions" that "unexpectedly and

22   unintentionally" results in personal injury or property damage during the policy period.

23   The parties do not dispute that the "damage" component of the "occurrence" definition

24   has been satisfied.  As to whether there was an "accident or a happening or event or a

25   continuous or repeated exposure to conditions," the Court finds that the conduct

26   underlying the various negligence-based claims, namely, failure to prevent sexual

27   molestation, qualifies as an "exposure to conditions" and thus falls within the definition

28   of "occurrence."  *See Interstate Fire & Cas. Co. v. Archdiocese of Portland*, 35 F.3d

1   1325, 1329 (9th Cir. 1994) ("[T]he occurrence is not the Archdiocese's negligent

2   supervision of Father Laughlin as such, but the 'exposure' of the boy to the negligently

3   supervised priest . . . .").

4       Whether the injuries flowing from the exposure were "unexpected" and

5   "unintentional" has not been established by the facts presented.  The Court is unaware of

6   any Arizona cases specifically addressing whether injuries resulting from failure to

7   prevent sexual molestation are expected and intentional.  The Arizona Supreme Court

8   has, however, had occasion to analyze both the purpose behind, and meaning of, the

9   "expected and intentional" language so prevalent in insurance policies.  *See Transamerica*

10  *Ins. Group v. Meere*, 143 Ariz. 351, 355, 694 P.2d 181, 185 (1984) (purpose); *Ohio Cas.*

11  *Ins. Co. v. Henderson*, 189 Ariz. 184, 186-91, 939 P.2d 1337, 1339-44 (1997) (meaning).

12      As explained by the court in *Meere*, all insurance contracts are driven by the

13  principle that "an insured seeks the safety of insurance against risks that are outside his

14  control and the insurer agrees to cover for a premium based on actuarial calculations of

15  the random occurrence (risk) of such events in a given population."  *Id.* at 355-56, 694

16  P.2d at 185-86.  Therefore, "'if a single insured is allowed through intentional or reckless

17  acts to consciously control risks covered by policy, the central concept of insurance is

18  violated.'"  *Id.* at 356, 694 P.2d at 186 (quoting 7A Appleman, *Insurance Law and*

19  *Practice*, § 4492.01 at 21 (1979)).  Clauses limiting coverage to conduct that results in

20  unexpected and unintentional injuries are "designed by the insurer to exclude

21  indemnification when the insured suffers a loss resulting from the exercise of his own

22  volition."  *Id.*  The exclusion applies because the insured "is assumed to have controlled

23  the risk."  *Id.*

24      The court expounded on and applied these principles more recently in *Henderson*,

25  a case which arose against a very different factual backdrop but is nonetheless controlling

26  here.  In *Henderson*, the court undertook an interpretation of an "expected or intended"

27  injury exclusion in a homeowner's insurance policy.  *Id.* at 185, 939 P.2d at 1338.  After

28  noting the considerable discord among courts as to the proper interpretation of such

language, the court held, as a general rule, that the language applies "if the act was intentional and there was either a *subjective desire* to cause some specific harm (intent) or *substantial certainty* (expectation) some significant harm would occur . . . ." *Id.* at 191, 939 P.2d at 1344 (emphasis added).  If the insured satisfied this test, that meant the insured "'controlled the loss and . . . fell within the category of risks which both the insurance contract and public policy consider uninsurable.'" *Id.* at 192, 939 P.2d at 1345 (quoting *Meere*, 143 Ariz. at 358, 694 P.2d at 188).

In this case, once it is assumed the Diocese had actual knowledge of instances of its priests' prior sexual misconduct, it is clear that the Diocese's choice not to take steps to prevent future abuse was an intentional decision.  A more difficult question is whether future abuse, and in particular the abuse at issue in the underlying suits, was "substantially certain" to flow from that decision.[3]  The answer depends heavily on the facts of each of the underlying suits.  How many instances of that priest's sexual misconduct was the Diocese aware of?  How much time had passed between the last known instance of misconduct and those instances at issue in the suit?  What remedial measures, if any, had the Diocese taken?  A conclusion simply cannot be reached in a vacuum.  Although Interstate Fire claims that, under *Henderson*, "intentionally placing a priest known to have sexually assaulted minors in a position to knowingly have access to minors" was so substantially certain to result in future abuse that intent to harm can be inferred as a matter of law, neither party has provided the Court with enough facts to determine what the Diocese knew, and what actions it took, to determine whether future harm was substantially certain to occur as a result of the Diocese's conduct or inaction. *See Diocese of Winona v. Interstate Fire & Cas. Co.*, 89 F.3d 1386 (8th Cir. 1996) (conducting a fact-intensive inquiry into the Diocese's knowledge and treatment of a priest's prior acts of sexual molestation in order to determine whether the plaintiff's abuse

---

[3] Interstate Fire does not argue that the Diocese had a subjective desire to cause the abuse and its resulting injuries.

1    was "substantially probable" and therefore "expected" under the definition of

2    "occurrence").

3           In view of the posture of this case, and the manner in which the issues of the

4    exclusionary effect of the definition of "occurrence" and the burden of proof as to this

5    issue were raised, the Court cannot say as a matter of law that there are no genuine,

6    material triable issues of fact present regarding whether the underlying claims constitute

7    an insurable "occurrence."  Without a clearer presentation of the facts regarding what the

8    Diocese actually knew and did or did not do, it seems likely there could arise a conflict in

9    the evidence as to the facts concerning whether there was an "occurrence" under the

10   policy which, in turn, determines Interstate Fire's obligation to indemnify the Diocese.

11   Accordingly, to grant summary judgment at this stage on the question of whether the

12   underlying claims constitute an "occurrence" would deprive the parties of a full hearing

13   on this issue.  As the parties have not presented sufficient evidence of what the Diocese

14   knew and the actions it did or did not take, and therefore how likely it was that harm was

15   substantially certain to result from its action or inaction, the motions must be denied

16   unless the claims are otherwise excluded.

17          **B.    Exclusions**

18          Interstate Fire asserts that even if there is an "occurrence" under the insuring

19   agreement, either the insuring agreement's exclusionary clause limiting liability for

20   assault and battery or the efficient proximate cause doctrine relieve it of any obligation to

21   indemnify the Diocese.  Interstate Fire has the burden of establishing the applicability of

22   any exclusions.  *See Keggi*, 199 Ariz. at 46, 13 P.3d at 788.  For the reasons discussed

23   below, the Court finds that Interstate Fire has not proven the applicability of either

24   exclusion.  Accordingly, Interstate Fire's motion for summary judgment on the issue of

25   the applicability of any exclusions is denied, and the Diocese's cross-motion for summary

26   judgment on this issue is granted.

27          **1.  Assault & Battery Exclusion**

28          Interstate Fire maintains that even if some of the claims against the Diocese are

1   initially covered under the insuring clause, they are nevertheless excluded by the assault

2   and battery exclusion clause in the insurance agreement.  The assault and battery clause

3   expressly precludes coverage for "liability of *any Assured* for assault and battery

4   committed by or at the direction of *such Assured* . . . ."  (emphasis added).  Interstate Fire

5   maintains that, because the clause precludes coverage for "any assured", and "such

6   assured" refers back to "any assured", the assault and battery clause operates as a

7   categorical exclusion barring coverage for both the insured who commits the assault and

8   battery and all innocent co-insureds.

9        In a fairly recent case, the Arizona Court of Appeals explained how the phrase

10  "any insured," as used in exclusionary provisions, is to be construed.  *See Am. Family*

11  *Mut. Ins. Co. v. White*, 204 Ariz. 500, 65 P.3d 449 (Ct. App. 2003).  At issue in *White* was

12  the following clause in a homeowner's insurance policy: "Violation of Law.  We will not

13  cover bodily injury or property damage arising out of . . . violation of any criminal law for

14  which any insured is convicted . . . ."  *Id.* at 503, 65 P.3d at 452.  The issue to be decided

15  was whether the clause precluded coverage of a negligent supervision claim against the

16  parents of a boy who had been convicted of aggravated assault.  Both the boy and his

17  parents were insureds under the policy.  *Id.* at 502-03, 65 P.3d at 451-52.  The court

18  distinguished "an insured" from "any insured," noting that while "an" refers to only one

19  object, "any" refers to one or more objects of a certain type.  *Id.* at 508, 65 P.3d at 457.  It

20  therefore joined the majority view that clauses referring to "any insured" bar coverage for

21  "any claim attributable to the excludable acts of any insured, even if the policy contains a

22  severability clause."  *Id.* at 507, 65 P.3d at 456.  The result of this interpretation of the

23  policy language is that when an exclusionary clause bars recovery for "any insured" if

24  "any" insured violates the exclusion, coverage for all innocent co-insureds is denied

25  notwithstanding their innocence.  *Id.* at 508, 65 P.3d at 457.

26       While the Court finds Interstate's reading of the assault and battery clause to be

27  credible, the clause at issue in this case is distinguishable from the clause in *White* in two

28  important respects.  First, the exclusionary clause here does not stop at limiting "liability

1  of any Assured for assault and battery."  Rather, it goes on to qualify the excluded

2  conduct with the phrase "committed by or at the direction of such Assured . . ." and

3  thereby excludes a narrower category of events than simply excluding all coverage for all

4  innocent co-insureds whenever any insured commits an assault or battery.  Further,

5  instead of excluding all liability or claims "arising out of" the commission of an assault or

6  battery, the clause excludes only the liability "*of* any Assured *for* assault and battery

7  committed by or at the direction of *such Assured* " (emphasis added).  The policy does not

8  categorically exclude all claims relating to, arising from, or having as a central factual

9  element the commission of an assault and battery.  These distinctions make all the

10 difference.

       The Court finds the best reading of the assault and battery clause is that "such

12 assured" means "that insured"; *i.e.,* the assured who committed or directed the assault and

13 battery.  If the intent behind the clause was to exclude coverage of "any and all" insureds

14 regardless of which insured committed the act, as Interstate Fire suggests, there would

15 have been no need to specify *who* committed or directed the act.  It would have sufficed

16 to stop at "liability of any Assured for assault and battery."  Or, indeed, if this broader

17 meaning was the intended scope of the exclusion, the policy would have replaced "such"

18 with "any" to unambiguously convey that intent.  It is a well-established canon of

19 statutory construction that courts are to give effect to all parts of a contractual provision

20 so as to avoid rendering one or more parts a nullity.  *Hanson v. Tempe Life Care Vill.,*

21 *Inc.*, 216 Ariz. 26, 27-28, 162 P.3d 665, 666-67 (Ct. App. 2007) (citing *Kintner v. Wolfe*,

22 102 Ariz. 164, 168, 426 P.2d 798, 802 (1967)).  Reading the clause to exclude liability of

23 any insured regardless of whether that person committed or directed the act would render

24 the "such" qualification a nullity.  While Interstate Fire's argument – that "such assured"

25 means "any assured" – is plausible, such a broad scope of exclusion overreaches the

26 language actually used in the clause.  Rather, the phrase "any Assured," read in

27 conjunction with the "such assured" qualification, is better read to mean "the insured who

28 committed the act of assault or battery."  The clause thus excludes only the liability of an

1   insured who actually commits or directs an act of assault or battery.

2          Additionally, by considering the second distinction as well, the meaning of the

3   clause is clear.  Rather than excluding liability for any claims "arising out of" an assault

4   and battery generally, the clause excludes liability "of any Assured," which, as explained

5   above, refers to the insured who committed or directed the act of assault or battery.  Had

6   the clause instead excluded *all* claims *arising out of* an assault or battery, such a clause

7   could have excluded from coverage claims of derivative liability of all innocent co-

8   insureds for the tortfeasor's acts because derivative negligence claims arguably "arise out

9   of" the underlying act.  Without such language, though, all derivative liability claims

10  cannot be so categorically excluded.  Rather, in the assault and battery clause at issue

11  here, the exclusion of liability attaches only to the person who committed or directed the

12  act and only excludes coverage for the tortfeasor.  As such, the Court concludes that the

13  clause only precludes coverage of the direct liability of any insured who commits or

14  directs an assault or battery.   Because the derivative claims against the Diocese are not

15  premised on allegations that the Diocese committed or directed an assault or battery, the

16  claims do not fall within the assault and battery exclusion.

17          The Court also finds this reading of the assault and battery exclusion to be the

18  most appropriate in view of Arizona's policy that "[i]nsurance policy provisions must be

19  read as a whole, giving meaning to all terms."  *Liberty Ins. Underwriters, Inc. v. Weitz*

20  *LLC*, 215 Ariz. 80, 83, 158 P.3d 209, 212 (Ct. App. 2007).  The term "any" still retains

21  meaning under this reading of the clause because it establishes the universe of insureds

22  who will lose coverage if he or she commits or directs an assault or battery.  The use of

23  "any" thus helps to define the category of persons who are subject to the exclusion if they

24  personally commit or direct an assault or battery.  Indeed, to read the clause as suggested

25  by Interstate Fire would render the term "such" in the clause meaningless; if the clause

26  was meant to exclude the liability of simply "any" assured, then there would have been no

27  reason to include the "such" assured qualifier in the exclusion clause.

28          Although the Court finds this narrower reading of the assault and battery exclusion

to be the correct interpretation of the clause, the Court also acknowledges the longstanding policy in Arizona that an ambiguous provision in an insurance policy is construed against the insurer.  *See Sparks v. Republic Nat. Life Ins. Co.*, 132 Ariz. 529, 534, 647 P.2d 1127, 1132 (1982).  Further, the general rule that ambiguous clauses are construed against the insurer applies "with even greater force where the ambiguity appears in an exclusionary clause."  *Coconino County v. Fund Adm'rs Ass'n*, 149 Ariz. 427, 431, 719 P.2d 693, 697 (Ct. App. 1986).  Therefore, even if the Court considered the assault and battery exclusion to be ambiguous, the result would be the same: the Diocese's narrower interpretation of the clause would be accepted over Interstate Fire's broader interpretation.

For all of these reasons, the Court will deny Interstate Fire's motion for summary judgment on the issue of the applicability of the assault and battery exclusion as to the derivative negligence claims against the Diocese.

## 2.  Efficient Proximate Cause

Interstate Fire maintains that the claims against the Diocese are nevertheless excluded because they would not have arisen but for the priests' acts of sexual molestation, which are indisputably excluded.  In support of its argument, Interstate Fire points to *American Family Mut. Ins. Co. v. White*, 204 Ariz. 500, 65 P.3d 449 (Ct. App. 2003), and a series of cases on which *White* relies.  After concluding that any violation of the exclusionary clause at issue precluded coverage for all innocent co-insureds in light of the clause's phrase "any insured," the court in *White* further held, "We also conclude that the negligent supervision claim against the Wildes is excluded because it derives from the claim against Travis, which is excluded."  *Id.*  In support thereof, the court cited to a line of cases standing for the general proposition that if conduct expressly precluded by an exclusionary clause occurs, all negligence-based claims deriving from that underlying conduct are also excluded, including those asserted against insureds other than the actor. *See id.* (citing *Behrens v. Aetna Life & Cas.*, 153 Ariz. 301, 302, 736 P.2d 385, 386 (Ct. App. 1987); *Lumbermens Mut. Cas. Co. v. Kosies*, 124 Ariz. 136, 138, 602 P.2d 517, 519

1   (Ct. App. 1979); *Northwest G.F. Mut. Ins. Co. v. Norgard*, 518 N.W.2d 179, 184 (N.D.

2   1994)).  While these cases do exclude coverage for derivative causes of action, they do so

3   based not on the efficient proximate cause doctrine, but rather on the clear language of the

4   exclusionary clause.  Interstate Fire's assault and battery exclusion does not contain the

5   same categorical language barring coverage for all claims *arising out of* an excluded

6   activity, and therefore does not similarly mandate the exclusion of all claims derivative to

7   an excluded claim.

8        In *Lumbermens*, the plaintiffs brought a claim of negligent entrustment against the

9   parents of a boy whose negligent driving caused an accident that killed their daughter.

10  124 Ariz. at 137, 602 P.2d at 518.  The son had been driving a family-owned vehicle.  *Id.*

11  The parents' homeowner's insurance policy excluded liability for bodily injury "*arising*

12  *out of* the ownership, maintenance, operation, [and] use" of any motor vehicle owned or

13  operated by the insured.  *Id.* (emphasis added).  The court held that because "it is evident

14  that negligent entrustment as a distinct and specific cause of action is not exclusive of, but

15  rather is derived from the more general concept of ownership, operation and use of a

16  motor vehicle[,]" it would be "illogical to conclude that the exclusionary clause does not

17  apply specifically to negligent entrustment of the vehicle."  *Id.* at 138, 602 P.2d at 519.  It

18  further explained, "Since there would have been no accident in this case without the use

19  or operation of an automobile, the exclusion clearly applies."  *Id.*  In so holding, the court

20  expressly rejected the argument that because a claim of negligent entrustment is a

21  "separate and distinct tort," it is not based on the underlying excludable conduct.  *Id.* at

22  137-38, 602 P.2d at 518-19.

23       In *Behrens*, the plaintiff asserted claims of negligent entrustment and negligent

24  supervision against the parents of a boy who caused her serious injuries while he was

25  operating a family-owned boat.  153 Ariz. at 302, 736 P.2d at 386.  The parents'

26  homeowner's policy excluded "bodily injury or property damage *arising out of* the

27  ownership, maintenance, operation, use, loading or unloading of any water craft[.]" *Id.*

28  (emphasis added).  The plaintiff argued that the exclusion applied "only to claims for

negligent operation of the boat and not to claims, such as negligent entrustment or supervision, involving negligence by insureds while not using the boat." *Id.* Relying on *Lumbermens*, the court rejected the argument, holding that because "[a] claim for negligent entrustment, or for that matter negligent supervision, cannot exist apart from the excluded negligent operation of the boat[,]" the negligent entrustment claim "necessarily includes negligence in the operation of the excluded item and thus *fits within the policy exclusion*." *Id.* (emphasis added).

Finally, in *Norgard*, a North Dakota case, the parents of a girl who had allegedly been molested in a home day care center brought a claim of negligent supervision against the day care operator. 518 N.W.2d at 180. At issue was whether the claim was excluded under a policy clause precluding coverage of "bodily injury or property damage *arising out of* sexual molestation, corporal punishment or physical or mental abuse inflicted upon any person by or at the direction of an insured, an insured's employee or any other person involved in any capacity in the day care enterprise . . . ." *Id.* (emphasis added). The parents conceded that all claims against the actual molester were excluded but argued that because the injuries giving rise to the lawsuit "arose from" the operator's alleged negligence, not the sexual molestation, the negligent supervision claim against the operator was not excluded. *Id.* at 184. The court disagreed, finding that the focus of the exclusion is the immediate cause of the injury, not the pleaded cause of action. *Id.* Because there would have been no liability but for the acts of molestation, the injuries "arose out of" the sexual molestation. *Id.* Therefore, the negligent supervision was excluded under the clear terms of the policy; not under the efficient proximate cause doctrine.

In response to Interstate Fire's argument that these cases support a holding that all derivative claims from an excluded cause of action are necessarily barred by the efficient proximate cause doctrine, the Diocese states that the efficient proximate cause doctrine is not applicable to the facts of this case. The Diocese argues that the efficient proximate cause doctrine operates only to exclude negligence claims derived from an excluded

cause of action where the policy language provides for a categorical exclusion, either barring recovery of "any insured" or barring recovery for all claims "arising out of" an excluded action.  The Court agrees with the Diocese's position.

The key distinction between the cases relied upon by Interstate Fire in support of excluding any negligence causes of action derivative to the sexual molestation claims is that the policy language at issue in those cases excluded coverage for either all insureds, including innocent co-insureds, or for all claims arising out of the excluded event.  In *White*, the exclusion language prohibited recovery for acts committed by any liability "*arising out* of . . . violation of any criminal law for which *any* insured is convicted . . . ." 204 Ariz. at 503, 65 P.3d at 452 (emphasis added).  The exclusionary language in *Behrens* and *Lumbermens* is similarly categorical and broad, and thus distinguishable from the language in Interstate Fire's exclusion.  In both *Behrens* and *Lumbermens*, the respective exclusionary clauses denied coverage for any action "arising out of" a category of excluded activities (in both cases, ownership and operation of the boat).  The derivative claims were excluded because they *arose out of* the excluded activity, and the policy language explicitly excluded all claims arising out of the excluded category of activities; they were not barred because the efficient proximate cause doctrine *per se* bars any and all derivative claim coverage.

Interstate Fire's assault and battery clause is not similarly broad, and does not support exclusion of the derivative liability claims asserted against the Diocese.  Instead, Interstate Fire's exclusionary clause excludes coverage only for any assured who commits or directs the commission of an assault and battery.[4]  While the claims raised against the Diocese for negligent entrustment and supervision could be said to have "arisen out of" the priests' sexual molestation, the policy language in Interstate Fire's exclusion does not exclude coverage for all claims arising out an excluded activity.  Because the assault and

---

[4] *See* the Court's discussion of Interstate Fire's assault and battery clause exclusion, *supra* Section III.(B).(1).

battery exclusion excludes coverage for a narrower category of claims (*i.e.,* the actual assault and battery), and not for all claims "arising out of" an assault and battery, the efficient proximate cause doctrine does not apply to exclude coverage of the derivative claims.  Had the Court adopted the broader view of the assault and battery exclusion urged by Interstate Fire, Interstate Fire's cited authority would be more on-point.  However, in light of the Court's reading of the assault and battery exclusion, the exclusion does not prohibit all claims against any assured arising out of an excluded assault and battery.  Interstate Fire's exclusionary clause therefore does not bar all derivative liability claims against the Diocese under the efficient proximate cause doctrine.

Interstate Fire also cites *Potomac Ins. Co. v. McIntosh*, 167 Ariz. 30, 804 P.2d 759 (Ct. App. 1990) in support of its argument that the efficient proximate cause doctrine should exclude coverage for any claims against the Diocese related to the priests' sexual abuse underlying all of the claims.  While *McIntosh* contains a more direct discussion of how the efficient proximate cause doctrine can be used to bar derivative negligence claims than *White* and the line of cases on which it relies, it too fails to support Interstate Fire's claim that *any* derivative claims to an excluded claim are necessarily excluded by the efficient proximate cause doctrine.

In *McIntosh*, an attorney formed a limited partnership with former clients of his law firm.  *Id.* at 30, 804 P.2d at 759.  The partnership failed, and the clients lost money they had invested in the partnership.  *Id.* at 31, 804 P.2d at 760.  The clients then sued the attorney for malpractice, breach of fiduciary duty, various fraud claims, breach of contract, and negligence.  *Id.*  The attorney maintained a malpractice insurance policy which excluded coverage for any claim made by or against any business enterprise (except the law firm) in which the attorney was a partner.  *Id.*  The policy also clearly excluded "liability *arising out of* [the attorney's] services and/or capacity as . . . [a] partner . . . of a business enterprise . . . ."  *Id.* (emphasis added).  The clients argued that they were only seeking recovery for the attorney's negligence in his role as an attorney,

1  and that the business enterprise exclusion should not apply to the attorney malpractice

2  claim.  *Id.*  The Court disagreed, finding that the clients' lost investments were primarily

3  and directly a result of the attorney's business decisions in his capacity as a limited

4  partner, and not from his negligence as an attorney.  *Id.* at 32-34, 804 P.2d at 761-63.

5  Because the insurance policy clearly excluded any claims for loss resulting from the

6  attorney's business activities, there was no coverage for the clients' loss, even though a

7  covered event (*i.e.*, the attorney's malpractice in his role as an attorney) may have also

8  contributed to the loss.  *Id.*

9       *McIntosh* is distinguishable from the facts of this case.  Interstate Fire's policy

10  exclusion is not a categorical one like the *McIntosh* policy, which excluded coverage for

11  *any* claims made against a business enterprise in which the attorney was a partner and for

12  any liability *arising out of* the attorney's role as a partner in a business enterprise.  Here,

13  Interstate Fire's exclusion only limits coverage for any assured when *such* assured

14  commits or directs an assault and battery; it does not exclude from coverage *any losses*

15  incurred as a result of any assault and battery or any claims *arising out of* an assault and

16  battery.  The Court in *McIntosh* used the efficient proximate cause doctrine not to exclude

17  derivative causes of action *per se*, but to determine whether the loss suffered was caused

18  by excluded business activity and thus fell within the policy exclusion.  Although the

19  clients were perhaps also harmed by the attorney's negligence in his capacity as an

20  attorney, the Court found that the direct cause of the loss was the attorney's investment

21  actions in his capacity as a partner in the business venture.  Since the policy exclusion

22  "clearly exclude[d] from coverage any losses incurred as a result of [the attorney's]

23  participation as a partner in a business enterprise," *id.* at 33, 804 P.2d at 762 (emphasis

24  added), the real issue in *McIntosh*, similar to *White* and the cases it relied upon, was the

25  scope of the exclusionary clause.  Because the clients' loss was incurred primarily as a

26  result of the attorney's business decisions, the loss was deemed to have been "incurred as

27  a result of [the attorney's] participation in the business" and was accordingly excluded

28  under the clear language of the policy.  The fact that there was another contributing,

indirect cause of the loss (*i.e.,* the attorney's negligence in his capacity as the clients' attorney) did not change the fact that the policy excluded coverage for *any* claim made against a business in which the attorney was a partner and for any liability *arising out of* the attorney's activities as a partner of a business enterprise.  Since Interstate Fire's assault and battery exclusion was not similarly broad and did not categorically exclude all claims arising out of an excluded assault and battery, *McIntosh* also does not support a holding that the efficient proximate cause doctrine excludes coverage here.

**IV.   Conclusion**

Neither Interstate Fire nor the Diocese have provided the Court with enough information to determine that there is no genuine issue of material fact regarding whether the Diocese knew with substantial certainty that its actions would lead to the harm suffered by the claimants.  Accordingly, summary judgment on the issue of whether these claims constitute an "occurrence" under the policy is inappropriate, and both Interstate Fire's and the Diocese's motions on this issue will be denied.  With respect to the theories of exclusion proffered by Interstate Fire, Interstate Fire has not proven that either the assault and battery exclusion or the efficient proximate cause doctrine provide a basis on which to exclude coverage for the claims against the Diocese.  Summary judgment on the issue of the applicability of either exclusion will therefore be denied as to Interstate Fire and granted as to the Diocese.

IT IS THEREFORE ORDERED that Interstate Fire's Motion for Summary Judgment (Doc. 36) is denied.

IT IS FURTHER ORDERED that the Diocese's Motion for Partial Summary Judgment on First Phase Issues (Doc. 38) is denied as to the issue of whether there was an "occurrence" under the policy and granted as to the applicability of the assault and battery exclusion and the efficient proximate cause doctrine.

1         IT IS FURTHER ORDERED setting a case management conference for

2    Wednesday, March 23, 2011 at 10:00 a.m.  The parties are directed to file proposed

3    individual or joint reports as to how the case should proceed no later than Friday, March

4    18, 2011.

5         DATED this 7th day of February, 2011.

6

7    _____

8                  Neil V. Wake
          United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28